[No. 26406-4-II. Division Two. August 3, 2001.]

IRON GATE PARTNERS, L.L.C., *Appellant*, v. THE DEPARTMENT OF TRANSPORTATION, *Respondent*.

*Leanne M. Bremer* and *Stephen W. Horenstein* (of *Miller Nash, L.L.P.*), for appellant.

*Christine O. Gregoire, Attorney General,* and *Stephen R. Klasinski, Assistant,* for respondent.

MORGAN, J. — Iron Gate Partners sued the Washington State Department of Transportation for a writ of mandamus. It claimed that the Department could not lawfully erect a traffic control device in front of its abutting property without giving it notice and an opportunity to be heard. The superior court rejected its claim, as we do also.

Iron Gate owns property on the west side of a "T" intersection formed by State Route 503 and Northeast 79th Street. SR 503 runs north and south, while N.E. 79th Street runs east and west. N.E. 79th runs east but not west from SR 503. Less than a quarter mile north, SR 503 intersects the new Padden Parkway.

On March 24, 1997, the Washington State Department of Transportation issued an access permit allowing Iron Gate to connect its property to SR 503. The access permit was issued pursuant to RCW 47.50.040(1), which provides that "[n]o connection to a state highway shall be constructed or altered without obtaining an access permit[.]" The access permit granted Iron Gate the right "to construct, use, and maintain, within the State highway right of way, a 28-foot Category II road approach to serve a self storage commercial lot only."[1] The permit stated in General Condition 13 that it did not affect the Department's "right to full supervision and control over all or any part of"[2] the roads; in General Condition 14 that it could be "revoke[d], amend[ed], or cancel[led] . . . at any time by giving written notice to [Iron Gate]";[3] in General Condition 18 that it is "subject to all applicable provisions of 468-51 WAC [and] Chapter 47.50 RCW";[4] and in Special Condition 26 that "[t]he Department may install median curbing to prevent left turn movements if justified by accident frequency."[5] When Iron Gate began using the permitted connection, a northbound driver on SR 503 could turn left into Iron Gate's property, and a southbound driver on SR 503 could turn right into Iron Gate's property.

In 1998, Clark County began work on the Padden Parkway. Its traffic consultants advised that northbound drivers on SR 503 wanting to turn left on Padden Parkway were likely to back up as far south as N.E. 79th Street, causing a high risk of collision with southbound drivers wanting to turn left on N.E. 79th Street. The County responded by asking the Department's permission to construct a concrete median that would prevent left turns at the intersection of SR 503 and N.E. 79th Street. The Department granted

---

[1] Clerk's Papers (CP) at 24.

[2] *Id.* at 25.

[3] *Id.*

[4] *Id.*

[5] *Id.* at 27.

permission without notice to Iron Gate.

The median was constructed in 1999. It prevents drivers northbound on SR 503 from turning left into Iron Gate's property, but it does not prevent drivers southbound on SR 503 from turning right into Iron Gate's property.

On May 17, 2000, Iron Gate sued for "a writ of mandamus compelling the State to remove the median"; for "a judgment . . . enjoining the State from taking any further action to eliminate or obstruct the northbound left-in movement off SR 503 into Iron Gate's property without affording Iron Gate a due process hearing"; and for an order "that the State proceed with providing Iron Gate a due process hearing."[6] The trial court denied relief, and this appeal followed.

As framed by Iron Gate, the question on appeal is whether "the . . . Department [may] install a median . . . without providing notice and an opportunity to be heard and without providing evidence of accidents at the access location[.]"[7] For the reasons that follow, the answer is yes.

■ Every state highway is a controlled access facility under chapter 47.50 RCW, unless it is a limited access facility under chapter 47.52 RCW.[8] As far as the record shows here, SR 503 is a controlled access facility.

Washington statutes distinguish accessing a controlled access facility, and accessing such a facility in a particular way. RCW 47.50.010(3)(b) provides:

> Every owner of property which abuts a state highway has a right to reasonable access to that highway, unless such access has been acquired pursuant to chapter 47.52 RCW, but may not have the right of a particular means of access. The right of access to the state highway may be restricted if, pursuant to

---

[6] *Id.* at 21.

[7] Br. of Appellant at 1.

[8] RCW 47.50.010(2).

local regulation, reasonable access can be provided to another public road which abuts the property.[9]

Washington statutes further distinguish a particular way of accessing a controlled access facility, called a "connection," from the facility itself and also from the "access permit" under which the "connection" is established and maintained. According to RCW 47.50.020(2), " '[c]onnection' means approaches, driveways, turnouts, *or other means of providing for the right of access to or from* [a] controlled access facility[.]" (Emphasis added.) According to RCW 47.50.030(1) and 47.50.040(1) respectively, "connections to or from the state highway system shall be regulated[,]"[10] and "[n]o connection to a state highway shall be constructed or altered without obtaining an access permit[.]"[11]

Based on the first of these distinctions, the State can sometimes change the flow of traffic on a controlled access facility without paying just compensation to an abutting landowner. In *Walker v. State*,[12] the plaintiffs owned a motel on the south side of the road. The bulk of their business came from westbound vehicles that turned left into the motel. The State installed a concrete barrier in the middle of the highway, without notice to the plaintiffs. The barrier prevented westbound drivers from turning left, although eastbound drivers could still turn right. The plaintiffs sued for an injunction or damages, and also for an order compelling the State to "follow the procedure of RCW 47.52[.]"[13] After noting that "[t]he owner of property abutting upon a public thoroughfare has a right to free and

---

[9] WAC 468-51-030(1) reiterates the same distinction. It provides:

Every owner of property which abuts a state highway . . . where limited access rights have not been acquired has a right to reasonable access, but may not have the right to a particular means of access, to the state highway system. The right of access to the state highway may be restricted if, in compliance with local regulation, reasonable access to the state highway can be provided by way of another public road which abuts the property.

[10] RCW 47.50.030(1).

[11] RCW 47.50.040(1).

[12] *Walker v. State*, 48 Wn.2d 587, 295 P.2d 328 (1956).

[13] *Id.* at 589.

convenient access thereto[,]"[14] and that such owner "is entitled to just compensation if this right is taken or damaged[,]"[15] the Supreme Court held:

> [T]he real basis of plaintiffs' claim for damages is the diversion of westbound traffic from their motel business.
>
> Plaintiffs have no property right in the continuation or maintenance of the flow of traffic past their property. They still have free and unhampered ingress and egress to their property. Once on the highway, to which they have free access, they are in the same position and subject to the same police power regulations as every other member of the traveling public. Plaintiffs, and every member of the traveling public subject to traffic regulations, have the same right of free access to the property from the highway. Re-routing and diversion of traffic are police power regulations. Circuity of route, resulting from an exercise of the police power, is an incidental result of a lawful act. It is not the taking or damaging of a property right.
>
> We have found no authority, nor has any been called to our attention, which allows, to the abutting property owner, damages allegedly arising from statutes or ordinances (a) establishing one-way streets; (b) forbidding "U" and left turns; or (c) authorizing the use of other suitable traffic-control devices deemed necessary by the proper authorities to warn, regulate, and guide traffic upon public thoroughfares.[16]

Given *Walker*, Iron Gate does not claim just compensation. It does claim, however, that it was entitled to notice and a hearing before the median was erected, and that the median must be removed until it receives such notice and hearing.

▮ Iron Gate argues that it is entitled to notice and hearing based on General Condition 18 of its access permit and WAC 468-51-120. General Condition 18 incorporates into the permit "all *applicable* provisions of 468-51 WAC

---

[14] *Id.*

[15] *Id.* at 590.

[16] *Id.* at 590-91 (emphasis omitted).

[and] Chapter 47.50 RCW[.]"[17] WAC 468-51-120(1) provides in part:

> The department may initiate an action to revoke any [access] permit if significant changes have occurred in the use, design, or traffic flow of the property or of the state highway, requiring the relocation, alteration, or closure of the connection . . . . The process to be followed by the department in the revocation of permits shall be consistent with the requirements of chapter 34.05 RCW [the Administrative Procedure Act] and WAC 468-51-150 [providing for judicial review].

By its terms, this regulation applies when the Department initiates an action to revoke an access permit. Iron Gate cannot claim that the Department *explicitly* initiated such an action here, for there is no evidence to that effect. Iron Gate nonetheless seems to claim that the Department *implicitly* initiated such an action by altering its "connection" to SR 503. This claim overlooks, as the Department correctly points out, the difference between a "connection" on the one hand and the highway on the other. A "connection" is an abutting owner's driveway or approach to the highway—in other words, a particular means of access to the road, not the road itself. It follows that a "connection" is not altered merely by changing the flow of traffic on the highway; it is altered by closing, moving, narrowing, or otherwise changing the abutting owner's driveway or approach to the highway. Because the Department did not alter Iron Gate's driveway or approach to SR 503, it did not affect Iron Gate's "connection" to SR 503; it did not initiate an action to revoke or otherwise modify Iron Gate's access permit; and WAC 468-51-120 does not apply here.

 Iron Gate argues that even if it is not entitled to notice and hearing by virtue of General Condition 18 and WAC 468-51-120, it is entitled to notice and hearing by virtue of Special Condition 26. That condition provides, as already seen, that "[t]he Department may install median curbing to prevent left turn movements if justified by

---

[17] CP at 25 (emphasis added).

accident frequency."[18] Iron Gate reasons that when the Department included the words "if justified by accident frequency," the Department undertook the burden of convening, and vested Iron Gate with the right to demand, an administrative hearing at which the Department bears the burden of proving that the median is "justified by accident frequency."

We reject this argument because the permit must be read as a whole,[19] and it expressly stated in General Condition 13 that it shall not "prevent the Department from using any of [the Department's] roads, streets, or public places, or affect [the Department's] right to full supervision and control over all or any part of them, *none of which is hereby surrendered*."[20] It is apparent, then, that Special Condition 26 was intended to reserve rights to the Department, but not to surrender rights to Iron Gate.

Finding the remainder of Iron Gates' arguments to be meritless, we affirm the trial court.

HOUGHTON and BRIDGEWATER, JJ., concur.

---

[18] *Id.* at 27.

[19] *Cf. Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 669-70, 15 P.3d 115 (2000) ("rules require interpreting the whole contract"); *Seattle First Nat'l Bank v. Mitchell*, 87 Wn. App. 448, 454, 942 P.2d 1022 (1997) ("[w]e interpret the lease . . . based upon the contract as a whole").

